| | |
|---|---|
| UNITED STATES DISTRICT COURT<br>SOUTHERN DISTRICT OF NEW YORK<br>------------------------------------------------------------ X<br>BOARD-TECH ELECTRONIC CO., LTD.,<br><br>                       Plaintiff,<br><br>                       -v-<br><br>EATON ELECTRIC HOLDINGS LCC,<br>COOPER LIGHTING LCC, and DOES 1<br>through 10,<br><br>                       Defendants.<br>------------------------------------------------------------ X | USDC SDNY<br>DOCUMENT<br>ELECTRONICALLY FILED<br>DOC #: _____<br>DATE FILED: <u>October 31, 2017</u><br><br><br>17-cv-5028 (KBF)<br><br>OPINION & ORDER |

KATHERINE B. FORREST, District Judge:

       In this case, Board-Tech Electronic Co., Ltd. ("Board-Tech"), a manufacturer and seller of light switches, asserts that its competitor, Eaton Corporation and Cooper Wiring Devices, Inc. ("Eaton"),[1] has engaged in false and misleading advertising. The nub of plaintiff's claim is that while defendants were authorized to apply the "UL" certification mark to certain products, those products did not in fact comply with the requisite safety standards. Eaton has moved to dismiss on two principle bases: (1) that by failing to specify which products are at issue (and instead only naming a range of products within three product categories), plaintiff has failed to comply with its basic Rule 8 pleading obligations, and (2) that in all events, plaintiff has failed to allege actionable falsity.

---

[1] The complaint initially named Eaton Electric Holdings LLC and Cooper Lighting LLC as defendants. On consent, Eaton Corporation and Cooper Wiring Devices have been substituted as defendants.

For the reasons set forth below, the Court agrees with the defendant and GRANTS the motion to dismiss.

I. FACTS ALLEGED IN THE COMPLAINT

The facts set forth below are taken from the Second Amended Complaint.[2] While the Court accepts as true all well-pled factual allegations, it does not do the same with regard to legal conclusions; to the extent such conclusions are cited below, the Court's purpose is solely to fully set forth plaintiff's claims.

Plaintiff Board-Tech, a Taiwanese Corporation, and Eaton, an Ohio Corporation, are competitors in the manufacture and sale of light switches.[3] Both have sought and obtained authorization from Underwriters Laboratories to apply its "UL" certification mark on products.

To protect against certain dangers, including electrical fires and the risk of human injury, the U.S. government, retailers, businesses and consumers demand that the electrical products being used comply with industry safety requirements. (Second Amended Complaint ("SAC"), ECF No. 46, ¶ 18.) In the case of light switches manufactured and sold by plaintiff and defendants, the prevailing standard is UL 20, applicable to "General Use Snap Switches." (Id.) The National Electric Code ("NEC") requires light switches in new buildings to be UL 20

---

[2] Defendants have attached a number of exhibits to the Declaration of Serrin Turner, dated September 22, 2017. (ECF No. 40.) The Court has only referred to Exhibits 3 and 4, the certification mark registrations. A court may properly take judicial notice of such registrations in connection with a motion to dismiss. See TCA Television Corp. v. McCollum, 839 F.3d 168, 173 (2d Cir. 2016) (taking judicial notice of copyright registrations at motion to dismiss stage).
[3] Defendant Cooper Wiring Devices, Inc. is a New York corporation acquired by Eaton Corporation in 2012.

compliant; the NEC has been adopted at the state or local level in all 50 states. (Id. ¶ 20.) Even where use of a UL 20 switch is voluntary under the law, consumers rely on labeling that a product complies with safety standards at the time of purchase. (Id. ¶ 21.) Many retailers, such as Wal-Mart, additionally require compliance for products they sell. (Id.) "In practice, no manufacturer can expect to successfully operate in the U.S. light switch market without representing that its switches comply with UL 20." (Id. ¶ 22.) "[T]he form of manufacturer representation that governments and consumers routinely require is a certification by a third party testing organization." (Id.)

Entities that are designated as Nationally Recognized Testing Laboratories ("NRTLs"), are tasked with rigidly testing products according to standards developed by the Occupational Safety and Health Administration ("OSHA"). (Id. ¶ 23.) "Consumers and retailers have also come to rely on an NRTL approval, certification or 'listing' as a mark of safety." (Id.) Underwriters Laboratories serves as an NRTL. (Id. ¶ 24.)

Underwriters Laboratories owns the "UL" certification mark. (Turner Decl. Exs. 3, 4.) The 1964 UL mark registration states, "The certification mark is used by persons authorized by applicant to indicate that representative samplings of the products conform to the safety requirements used by the applicant." (Id., Ex. 3, p. 2.) The 2000 registration similarly provides, "The certification mark as used by persons authorized by applicant certifies that representative samplings of the goods conform to the requirements of the applicant." (Id., Ex. 4, p. 2.)

3

In order to be authorized to apply the UL mark, a manufacturer must provide six sets of representative samples of switches they want certified to an NRTL, such as Underwriters Laboratories, for testing. (Id. ¶ 29.) The light switches must then pass a series of tests detailed in the booklet UL Standard for Safety for General-Use Snap Switches, UL 20, May 10, 2010, revised February 17, 2012. (Id. ¶ 27.) "Of course, an NRTL cannot test every product a manufacturer offers for sale prior to sale, and cannot be certain the samples provided by the manufacturer are of the same quality, or share the same properties as those the manufacturer sells to consumers." (Id. ¶ 29.) "Accordingly, NRTLs do not guarantee the products actually sold by a manufacturer comply with the applicable safety requirements; they only certify that a purportedly representative sample did." (Id.) Thus, according to plaintiff, "If a product carries [the UL Listing Mark], it means UL found that **a representative sample** of that product met UL safety requirements **and the manufacturer is representing that the product meets those requirements**." (Id.) (Citing a portion of the UL website) (emphasis in original).

Plaintiff further asserts that consumers rely on the certification mark or listing, and base their purchases on the belief that every product containing a mark or that is listed actually complies with the applicable written safety standards. (Id. ¶ 30.) After testing a product sample that meets requirements, "Underwriters Laboratories authorizes the use of its certification marks, on their products, packaging, and in their marketing and advertising, but according to the company, it is the responsibility of the manufacturer to ensure that all of the products it sells

4

bearing the UL mark actually comply with the standards tested for, not just the samples that were tested." (Id. ¶ 31.)

"All of Defendants' light switches at issue in this case have been 'listed' or 'classified' by Underwriters Laboratories." (Id. ¶ 26.) Furthermore, "each of Defendants' light switches manufactured, marketed, advertised, and sold bearing the UL mark have in fact been granted permission for such use and 'listed' by Underwriters Laboratories as complying with UL 20." (Id. ¶ 32.)

Plaintiff asserts that in 2015–2017, it tested samples of switches actually sold by defendants, and that bear the UL mark. (Id.) The switches tested did not comply with the UL 20 standards. (Id.) Plaintiff alleges that it tested eight sets of six light switches (48 in total) from defendants' 7500, 7600, and 7700 series of products, for compliance with the UL 20 standards, and that all failed (Id. ¶¶ 37–39.) Based upon this testing, plaintiff asserts that "**none** of the General-Use snap switches identified in Exhibit A that Defendants advertise, market, and sell to consumers as UL Certified and compliant with UL 20 standards actually complies with those standards." (Id. ¶ 48.)

Plaintiff alleges that because defendants' light switches do not meet the UL 20 testing requirements, defendants' advertising that their light switches are UL 20 compliant is actually false and misleading. (Id.)

II.     THE CLAIMS

Plaintiff has asserted claims for false advertising under the Lanham Act, 15 U.S.C. § 1125(a) (First Cause of Action), unjust enrichment (Eighth Cause of

5

Action), and various state law claims arising under the laws of New York (Second and Third Causes of Action), California (Fourth and Fifth Causes of Action), Illinois (Sixth Cause of Action), and Texas (Seventh Cause of Action). As discussed below, all of the claims require some showing of falsity or other wrongful or inequitable conduct.

III. LEGAL PRINCIPLES

    A. Motion to Dismiss

On a motion to dismiss, this Court accepts as true all well-pleaded factual allegations. See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). This means that the Court must accept plaintiff's factual allegations in its complaint as true and draw all reasonable inferences in plaintiff's favor. See Famous Horse Inc. v. 5th Ave. Photo Inc., 624 F.3d 106, 108 (2d Cir. 2010). To withstand dismissal, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Iqbal, 556 U.S. at 678 (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678. In applying this standard, the Court accepts as true all well-pled factual allegations, but does not credit "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action." Id. The Court will give "no effect to legal conclusions couched as factual allegations." Port Dock & Stone Corp. v. Oldcastle Ne., Inc., 507 F.3d 117, 121 (2d Cir. 2007) (citing

6

Twombly, 550 U.S. at 555). If the Court can infer no more than the mere possibility of misconduct from the factual averments—in other words, if the well-pled allegations of the complaint have not "nudged [plaintiff's] claims across the line from conceivable to plausible"—dismissal is appropriate. Twombly, 550 U.S. at 570.

B. Certification Marks Generally

Section 1054 of the Trademark Act provides for the registration of certification marks. 15 U.S.C. § 1054. The statute provides that "when registered they shall be entitled to protection provided herein in the case of trademarks, except in the case of certification marks when used so as to represent falsely that the owner or a user thereof makes or sells goods or performs the services on or in connection with which such mark is used." Id. A certificate of registration for such a mark sets forth the rights and limitations of use with goods and services. 15 U.S.C. § 1057. Any person who believes that he has been damaged by dilution, likelihood of dilution, dilution by tarnishment, may commence an action to cancel the registration. 15 U.S.C. § 1064. With regard to a certification mark, such an action may be commenced at any time on the ground that the registrant:

> (A) does not control, or is not able legitimately to exercise control over, the use of such mark, or (B) engages in the production or marketing of any goods or services to which the certification mark is applied, or (C) permits the use of the certification mark for purposes other than to certify, or (D) discriminately refuses to certify . . .

15 U.S.C. § 1064(5). Certification marks are "designed to facilitate consumer expectations of a standardized product, much like trademarks are designed to ensure that a consumer is not confused by the marks on a product." Idaho Potato

7

Commission v. M & M Produce Farm & Sales, 335 F.3d 130, 138 (2d Cir. 2003). The certification mark regime "protects a further public interest in free and open competition among producers and distributors of the certified product." Id.

    C. False Marketing and Advertising

Plaintiff's First Cause of Action is for false and deceptive advertising and marketing under the Lanham Act. Section 1125 of the Lanham Act provides:

> Any person who, on or in connection with any goods or services . . . uses in commerce any . . . false or misleading description of fact, or false or misleading representation of fact, which . . . in commercial advertising or promotion, misrepresents the nature, characteristic, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1).

The first and most obvious element of a false advertising claim is a plausible allegation of falsity.[4] Apotex Inc. v. Acorda Therapeutics, Inc., 823 F.3d 51, 63 (2d Cir. 2016). Falsity may be adequately alleged in two ways. First, a plaintiff may allege facts plausibly supporting literal falsity—that is, that an advertisement is false on its face. Id. In such a case, consumer deception is presumed. Id. "This inquiry requires evaluating 'the message conveyed in full context.'" Id. (quoting Time Warner Cable, Inc. v. DIRECTV, Inc., 497 F.3d 144, 153 (2d Cir. 2007). When read in context, if the words or images imply a false message, the advertisement is literally false. Id. However, only unambiguous messages can be literally false. Id.

---

[4] Falsity, deception or other wrongful or inequitable conduct is also an element of each of the state law claims.

8

(citing Time Warner Cable, 497 F.3d at 158). A second way of adequately alleging falsity is to set forth facts plausibly supporting that the advertisement, while not literally false, is nevertheless likely to mislead or confuse consumers. Id. (citing Time Warner Cable, 497 F.3d at 153). To do this requires a comparison of the *impression* left by the statement (and not the statement itself) with the truth. Id.

IV. DISCUSSION

Defendants seek dismissal on two separate and independent bases: first, that because plaintiff has failed to allege the specific products that failed its testing, it has failed to provide adequate notice under Rule 8 of the Federal Rules of Civil Procedure and has failed to allege a plausible set of facts entitling it to relief under Twombly. Second, defendants assert that plaintiff's allegations of falsity are inadequate as a matter of law. The Court agrees that both bases require dismissal.[5]

A. Lack of Adequate Specificity

Plaintiff has now twice amended its complaint. And twice it has failed to specify the precise products at issue in this lawsuit. This is a significant failing. See, e.g., Segedie v. Hain Celestial Grp., Inc., 14-cv-5029, 2015 WL 2168374, at *12 (S.D.N.Y. May 7, 2015) (finding a Lanham Act complaint to be insufficiently specific where it stated that the products falsely labeled include 'but are not limited to' the products listed by name in the complaint and allowing the claim to go forward only for those products which had been specifically named).

---

[5] As both of these issues apply to each of the state law claims, those claims are dismissed as well.

As Board-Tech alleges in the SAC, it is a direct competitor with defendants for the manufacture and sale of light switches. (SAC ¶ 3.) Plaintiff alleges that it has tested a sampling of defendants' switches: eight sets of six light switches. Its claims, however, broadly encompass several product lines: the 7500, 7600, and 7700 series. Somewhere in this series of products are those that were specifically tested; they have not been identified. According to plaintiff, proceeding in this manner is akin to proceeding according to "sampling" that has been accepted in other cases.

Plaintiff misconceives the concept and use of "sampling." Under the circumstances here, the lack of specificity dooms plaintiff's claims under both Twombly and Rule 8. Here, plaintiff's claims are not, for instance, that very specific loan files may serve as samples of a larger set. See, e.g., Fed. Hous. Fin. Agency v. UBS Americas, Inc., 858 F. Supp. 2d 306, 324, 328 (holding that loan-sampling results were "sufficiently suggestive of widespread accuracies" to meet the plausibility standard, but only where the plaintiff pled with specificity as to certain loan files and then extrapolated to the whole). In contrast, Board-Tech has been non-specific as to any light switches at all.

Moreover, plaintiff has failed to state on what basis he can extrapolate from his few non-specific switches to entire product lines. Under Twombly, this Court cannot conclude that testing just six non-specific light switches provides a plausible

10

basis upon which to tether claims as to more than 125 others.[6] To extrapolate in the manner that plaintiff has—from the relatively few to the many—plaintiff would need to have included sufficient facts to support a conclusion that because of similarities or characteristics of a particular nature, test results for certain switches are indicative of what similar tests would reveal for other products. There are no such allegations. Plaintiff simply (and without factual basis) asserts that its own limited testing is enough to make claim that "none" of defendants' "General-Use snap switches in Exhibit A" comply with UL 20. (SAC ¶ 48.)

In addition, failure to provide any allegations as to which product(s) within a broader product line failed is necessary in order for defendants to investigate the claim and prepare a defense. A complaint also provides important guidance as to what is likely to relevant discovery, and what is not. But by grouping all products in the three lines together – most of which were never tested – plaintiff fails to provide adequate notice.

Moreover, plaintiff was on notice of the instant Rule 8 and <u>Twombly</u> deficiencies when defendants filed their initial motion to dismiss, and when the Court discussed this issue at the initial conference. Despite having now twice amended the complaint, plaintiff has not remedied the issue. Its refusal to specify the particular products tested concerns the Court. It is plain that commencing such a broad lawsuit is a declaration of war on a competitor. If allowed to proceed in

---

[6] Plaintiff believes that the actual number of switches in the series is closer to 30, in a variety of colors. (Plaintiff's Opposition to Defendants' Motion ("Pl.s' Opp."), at 7.) Whether plaintiff seeks to extrapolate from six to 30 or from six to more than 100 does not change this Court's analysis that he has not alleged a <u>factual basis</u> for doing so.

11

such a broad manner, plaintiff would no doubt seek access to the internal design of competitive products as well as highly sensitive technical data. Damages discovery would involve all of defendants' sales of this series of products.

Plaintiff has failed first to state with specificity which products failed UL testing, and then to provide factual allegations as to why those products' deficiencies can be extrapolated to other General Use snap switches. The Court therefore concludes that it has not pled with the specificity required by Rule 8 and Twombly.

B. A Lack of Falsity

As set forth above, the heart of a false advertising claim is falsity. Apotex, 823 F.3d at 63. Here, plaintiff alleges that inclusion of the UL certification mark conveys the false impression that defendants' light switches comply with UL 20. Plaintiff alleges that NRTLs "do not guarantee the products actually sold by a manufacturer comply with the applicable safety requirements; they only certify that a purportedly representative sample did." (SAC ¶ 29.) Plaintiff also acknowledges that each of defendants' products "have in fact been granted permission" to bear the UL mark, (SAC ¶ 32), and that "[a]ll of Defendants' light switches at issue in this case have been 'listed' or 'classified' by Underwriters Laboratories . . . ." (Id. ¶ 26).

Plaintiff's claim is based in the distinction between *authorization* to apply the UL mark and *actual compliance* with the standards referenced by the mark. As set forth above, plaintiff concedes authorization. It alleges, however, that despite such authorization, the products fail to comply with the safety standards. (See SAC ¶¶

12

30–31.) Looked at another way, plaintiff's claim is that even if defendants are authorized to use the mark, they are deceiving customers by using it. In support, it relies on Burndy Corp. v. Teledyne Indus., Inc., 748 F.2d 767, 774 (2d Cir. 1984), for the proposition that products bearing a UL mark can give rise to false advertising under the Lanham Act, and on Midwest Plastic Fabricators, Inc. v. Underwriters Laboratories, 906 F.2d 1568, 1569 (Fed. Cir. 1990) for the proposition that the responsibility of ensuring compliance remains with the manufacturer. (Holding that "the manufacturer agrees that it will ensure that the products bearing the UL mark are in compliance with [UL's] requirements" and that "a testing and inspection program will be maintained by the manufacturer to assure continued compliance.")

But plaintiff's reliance is misplaced; in Burndy, defendants had made changes to the advertised product after UL certification, never submitted those changed products to UL for testing, and continued to apply the UL mark. Burndy, 748 F.2d at 769. Plaintiffs notified UL of the problem, UL tested the new products and found them noncompliant, and only then did plaintiffs make their claim. Id. It was, in fact, the *unauthorized* use of the mark that allowed a Lanham Act claim to arise, and UL itself was the sole arbiter of whether the product in question was compliant. No such circumstances are alleged here. There are no allegations that defendants altered their products post-UL approval. Midwest Plastic, while finding a continuing obligation of manufacturer compliance with UL standards, goes on to define this compliance as, inter alia, maintaining a testing and inspection program

13

to assure compliance and providing access to UL inspectors. 906 F.2d at 1569–70. Plaintiff does not allege that Eaton has failed to maintain a testing and inspection program with regards to the Series 7500, 7600, or 7700 products. Rather, plaintiff's claim relies upon <u>its own</u> testing of the light switches—effectively attempting to supplant UL's responsibility to do so.

For plaintiff's theory to support a claim in this case, the *authorized* use of the mark must nonetheless be capable of being a deceptive use. It is not. The UL mark is limited by the scope of its registration. Its registration explicitly states that the "mark is used by persons authorized by applicant to indicate that representative samplings of the products conform to the safety requirements used by the applicant." (Turner Decl., Ex. 3, p. 2.) Defendants' use of the mark, as alleged by plaintiffs, indicates only that a representative sampling has conformed to the safety requirements; plaintiff here concedes that defendants' light switches went through United Laboratories' approval process. (SAC ¶ 32.)

It may be that plaintiff's own testing shows that certain of the light switches that bear the UL mark do not in fact comply with the safety standards. The Court accepts that allegation as true for purposes of this motion. But if defendants are authorized to apply the mark (which plaintiff concedes they are), then plaintiff is simply policing the mark. It is up to United Laboratories to police the mark. To the extent plaintiff believes that the mark has been diluted – or tarnished – by a failure to properly police it by United Laboratories, a remedy is available under 15 U.S.C. § 1064(5): plaintiff may seek to cancel the mark.

14

A number of thorny issues would arise if this Court were to allow this action to proceed. First, it would allow a competitor to police a certification mark. Private testing of a product against standards could be used to commence a lawsuit that could expose competitive design and information to precisely the entity that should not have it. While there are many cases in which competitors are proper plaintiffs – and do obtain discovery – one should not open the floodgates to such litigation without careful consideration. Careful consideration here requires dismissal.

V. CONCLUSION

For the reasons set forth above, the Court GRANTS the motion to dismiss. The Clerk of Court is directed to close the motion at ECF No. 27 and to terminate this action.

SO ORDERED.

Dated: New York, New York
October 31, 2017

_____
KATHERINE B. FORREST
United States District Judge